Case No. 22-1142. Grayscale Investments, LLC Petitioner v. Securities and Exchange Commission. Mr. Verrilli for the Petitioner and Ms. Verrilli for the Respondents. Good morning, counsel. Mr. Verrilli, please proceed when you're ready. Good morning and may it please the Court. I'm Don Verrilli for Petitioner of Grayscale. This appeal challenges an SEC order disapproving an exchange's request to list an exchange-traded product that holds bitcoin as its underlying asset. The fundamental problem with the order is that it contradicts previous SEC orders giving the green light to bitcoin futures ETPs that pose the same risk of fraud and manipulation and have in place the same CME surveillance mechanism to protect against those risks as the spot bitcoin ETP that the SEC disapproved here. That is the definition of arbitrary decision-making and it's worse than that because the decision actually dis-serves the policies set out in Section 6B-5 of the Exchange Act. This is not your typical APA appeal. We are asking to be regulated in this way, not to hold regulation at bay. Regulating us in this way would better protect investors because it would give them the benefit of oversight by NYSE ARCA on the basis of the surveillance and sharing information from the CME. Disapproval leaves the investors in a situation in which trading will continue on an over-the-counter market that is largely unregulated and therefore they are less protected. Beyond that, it hardly serves the statutory goal of removing impediments to a free and open market to leave $4 billion in value locked up in this fund as a result of it not being an ETP. Disapproval discriminates between issuers of futures ETPs and issuers of spot ETPs which also the statute prohibits. So I think it might be helpful if I take a minute at the outset to do a bit of a deeper dive on the contradiction between the two orders. I think the place to start is with the language of the statute of 6B-5. The statute provides that in order to approve an application, the SEC has to conclude that the rules of the exchange have in place measures designed to prevent fraudulent or manipulative activities. With respect to the spot ETP that's at issue here, the Commission concluded that that standard wasn't met. But Bitcoin futures ETPs that the SEC approved are going to be affected by manipulation of the spot markets. The SEC said that exact thing in the 2-prime order and it stands to reason. Bitcoin futures are derivatives of Bitcoin itself and the undisputed record evidence shows that 99.9% of the time the price of Bitcoin futures and the Bitcoin spot market correlate. What the SEC also found in the futures orders is that the existence of the surveillance sharing agreement would suffice to protect against fraud manipulation of the spot market as well as other unregulated futures markets. The reason for that is because the SEC concluded that manipulation of the spot market or manipulation of the other unregulated futures markets would show up in the price and the regulated futures markets. So how do we know that the 2-prime order in making the statements that you just paraphrased was specifically talking about manipulation of the spot market as opposed to manipulation of unregulated futures markets? I would direct the Court to pages 21, 679, and 680 of the 87th Federal Regulation, which is the 2-prime order. I know the Commission makes that argument in its brief here. The Court can of course read for itself the relevant paragraphs on those pages. I think it's extremely hard to read them as not addressing spot as well as unregulated futures markets. If one looks at the preceding paragraph, there's a discussion. I think it comes up five or six times, the question of spot markets as well as unregulated futures markets. And then with respect to that, the exact phrase that we pointed to where the Commission says CME surveillance can reasonably be relied upon to capture the effects on CME futures markets, whether the attempt is made by directly trading on the CME Bitcoin futures market or by trading outside of the CME Bitcoin futures market. If I'm remembering correctly, I think the immediately preceding sentence is talking about spot markets. And I think that the SEC must have concluded that that was the case because otherwise it couldn't have concluded that the statutory standard was met. The statutory standard requires that the design of the exchange rules be sufficient to prevent fraud and manipulation. And so it had to have concluded that the existence of the CME surveillance mechanism was going to pick up spot market manipulation insofar as it affected the futures prices. And that exact mechanism is operating now with respect to the relationship between NYSE ARCA and CME. The previous SEC denials of spot Bitcoin ETPs, were those challenged in court? I don't believe they were. I believe this is the first one. I couldn't find anything. So a lot of this really turns on the fact that the SEC has now decided to allow future Bitcoin futures ETPs and the failure to treat the two similarly. I do think, I think our case is quite a bit stronger given the fact, not the fact of, but the reasoning behind the approval of the futures ETPs. I think even if the SEC had not done so, we'd probably be here making a similar argument that CME surveillance would work in exactly the way that the SEC found that it worked in the two Krim and Valkyrie orders. But you don't have to take our word for it because they have made that finding in those orders. I do wonder if we were to agree with you that the SEC has behaved arbitrarily and capriciously in treating these two products differently. Do you think the SEC will then have to approve the spot Bitcoin ETPs or might the SEC simply reverse its determination about Bitcoin futures ETPs? We're asking for the standard remedy. We're asking that the order be set aside, which means we go back to the Commission. And it seems to me they would have three options available to them. First, they could agree with us that the prior reasoning really compels the conclusion that this also has to be approved because the risks aren't any different and the protections aren't the same. The other option, I suppose we could try to come up with some different distinction. I don't know what that would be. The third option would be to say, well, we've got to rethink the whole thing. I guess nothing would prevent them from doing that. I assume you don't want the third thing. Would it surprise me if they would do it, though? I mean, you have these futures ETPs that because of an oddity of the statute got through under the 1940 Act, you have additional futures ETPs that the Commission has approved under the 1934 Act. They're out there trading. There's billions of dollars of assets wrapped up in them. The Commission just made this. These decisions were roughly contemporaneous. The two-cream order was just a couple of months before ours. So presumably they were thinking about these things together. And as I said, it would surprise me a great deal if they decided to rethink the whole thing. But I don't see anything that forecloses them from doing so. Do you think that second route is available of the three that you just itemized, which is that they could come up with an explanation? Because I understood your argument to be almost one of an economic identity. Well, I think that's why I said I can't come up with it. I mean, it's theoretically available, but I'm not sure what it would be if you take as a baseline the approval of the futures contracts because of the unrebutted record evidence showing 99.9% correlation in the movement of the two, which, of course, stands to reason. And if I could just address one of the specific arguments the Commission has made in this regard, namely that while the futures markets aren't actually priced based on the spot prices, I will point out first they rejected that exact argument in the two-cream order. But beyond that, just as a matter of common sense, on the day that a futures contract expires and you've got to deliver, the price at which you have to deliver is the spot market value on that day. And Bitcoin futures are settled in cash. You don't actually deliver a Bitcoin. You settle it in cash. It's that kind of a contract. So by definition, the spot market is dictating the price of the futures on the day of settlement. And so, of course, movements in the spot market before the day of settlement are going to affect the price of what people anticipate the value of the futures contract. Of course. It's just, I mean, they suggest the contrary, but I don't see how they can do so. And I will say with respect to the reasoning there, as I read the order at least, the sum total of their reasoning as to why you can't make that assumption is in one sentence in footnote 233 of the order. And it's where they say, we have found correlation, but correlation doesn't prove causation. That's it. That's one unelaborated sentence. But I think the problem for them is that there is unrebutted expert analysis here, and I point to Professor Whaley's submission, his comments. He's a esteemed professor, expert in this area. He walked through the analysis of why it's not random. And, of course, it's not random for the reason I just said. Of course the prices are going to move together for the reason I just said. So that one sentence seems to me doesn't come close to meeting the bar that they have to meet to demonstrate that this is reasoned decision making. One of the things that the SEC seems to really emphasize in its briefing is this idea that it's not focused on the potential for fraud, but only the regulatory detection of fraud. What do you say to that argument? Is that consistent with the statute? It's a little bit hard, right? You took the words out of my mouth. The statute requires them, before approving, to find that the exchange has rules in place that are designed, I think design is the word in the statute, to prevent the fraudulent practices that would affect the product for which approval is sought. So in order to find that the statutory standard is met, which they did with respect to the futures ETPs, they have to reach the conclusion that the surveillance sharing mechanism meets that requirement. And with respect to that, a couple of points I'd like to make, if I could. First one is that what they concluded in Tukrim and Valkyrie is just indisputable that there is a risk that fraud and manipulation on unregulated markets, unregulated futures markets and unregulated spot markets, could affect the price of the regulated CME Bitcoin futures market. That risk is there. The sponsor of those funds came in and said, you don't have to worry about that risk, it's not there. The SEC said, oh yes it is there, it's there. But the CME surveillance agreement suffices to protect, because it will show up and then the information will be shared with the exchange on which the ETP is listed and the exchange can use its enforcement mechanisms to deal with it. That's the logic, the statement on those paragraphs that I quoted, that I cited previously in the Tukrim one. Now here, and I do think this is fundamentally arbitrary, and it's not arbitrary in the sense of the gotcha sense that they did it one way in Tukrim and they did it another way here. It's fundamentally arbitrary. In our case they said, no, no, you don't meet our significant market test because you don't have an agreement with a market that, you don't have an agreement with a market that someone who wanted to manipulate the spot market would have to manipulate in order to do so. That's what they said, and that's really the core of their rejection of our application. And again, I know I'm doing this a bit, but I think it's useful, going back to the Tukrim order, CME surveillance can reasonably be relied upon to capture the effects on CME futures markets, whether the attempt is made by directly trading on the CME Bitcoin futures market or by trading outside of the CME Bitcoin futures market. And they go on to say, accordingly, for present purposes it is unnecessary for ARCA to establish a reasonable likelihood that the would-be manipulator would have to trade on the CME itself to manipulate the proposed ETP. So they said that because of the surveillance agreement, that the sponsors of those futures ETPs didn't have to demonstrate the existence of an agreement with a market on which it's reasonably likely that a would-be manipulator would have to trade and manipulate. And here, they insisted that we did. And so you just cannot put those two things together. That, I think, is at the core of the problem with their reasoning, that either they were right in Tukrim or they're right here, they can't be right in both situations, and that's why you can't defer to them. There just isn't a basis for deference here, because you have to defer to their expert judgment that the CME surveillance agreement would take off the fraud in unregulated markets, or you have to agree with them here that it wouldn't. You can't do both. Has the SEC here waived our reliance on deference? I didn't hear you. Has the SEC here, do you think, waived a reliance on deference? I think they made a gesture towards deference, Your Honor, but with respect at least to the statutory interpretation question, and I'll just take a minute on that. I want to clarify what our statutory interpretation argument is. The essence of our argument there is that what the statute says, the statute says that the SEC shall approve an application that it finds meets the standard. So there's discretion there. It says it finds. I understand that. But then what it has to find is that the design of the exchange's rules is sufficient to prevent fraudulent manipulative practices. That's what it has to find. Now, I suppose if the SEC has adopted this significant market test as a gloss on that statutory standard, I suppose if they apply it in the way that they applied it in the two Greenham and Valkyrie orders, you could say it's consistent with the statute because they said, well, the CME surveillance actually works to pick up fraud and manipulation on unregulated markets that affects the regulated market, and because of that mechanism, we're going to allow this to go forward. Our position is that it is inconsistent with the statute to interpret it and apply it in the way they applied it here because they're saying that even though if you take what they found in two Greenham and Valkyrie, even though the CME surveillance would pick up the spot market fraud and manipulation and that information would be shared with the exchange and so it could use its enforcement powers, the way that whole system is supposed to work, even though that's true, we're not going to approve this. So even though the exchange does have rules designed to prevent fraud and manipulation and they've operated precisely the way the SEC approved in two Greenham and Valkyrie, we're still going to disapprove it. So that's not just an arbitrary and capricious problem. It seems to us that's a problem of statutory interpretation. But your arbitrary and capricious argument is the one that you front, and that there's arbitrary discrimination, and as to that, there's not a question about deference to statutory interpretation. That's just a straight-up... Correct, but I guess what I would say is deference to expertise. I don't see how you can defer to their expertise in the typical arbitrary and capricious review in the sense that their expert judgment in the prior order isn't expert judgment in this order completely. Right, but that's not Chevron deference. We're talking about arbitrary and capricious review. So deference in respect to the views about the record. I have one, but I want to make sure that... I have just one factual question, and it doesn't have to do with the issues that are directly before us, but just for our identification. So the briefing talks about this $4 billion delta between what could be captured and what is captured, and that just immediately sends off flags about arbitrage. And I guess I'm just wondering why... Is it the case that it's because of the lack of the approval of your application that that exists? And what would happen the minute, suppose, that the application is approved? Then would it just immediately collapse? Why does that persist? So it persists because if we don't have... If the trust doesn't have ETP status, it can't engage in... which is what would bring the value of the trust into line with the actual value of the assets. And that's a very substantial problem, as the record shows. So ETP approval would eliminate that impediment. Now, I don't know that that means that... I apologize. I probably should have known this. I don't know whether we jump immediately to... But it's the redemption mechanism that's the key, and that's preconditioned on approval of the ETP. That's the key to the whole thing. And that's why I think denying approval does disserve investors and what everyone thinks about the investors' interests themselves. The statute does say that one of the SEC's jobs in applying 6B-5 is to remove impediments to a free and open market. And this is obviously... A lockup of $4 billion is obviously an impediment of that kind. Okay. Make sure my colleagues don't have additional questions for you. We'll give you some rebuttal time, Mr. Milley. Thank you. Thank you. Ms. Parisi. Thank you, Your Honors. And may it please the Court, Emily Drew Parisi for the Securities and Exchange Commission. The Commission's order should be upheld because it was the product of reasoned decision-making, reasonably distinguished the prior approval of different products, and was faithful to the statutory scheme that Congress enacted in Section 19, which says that the Commission shall disapprove SRO rule proposals where the Commission cannot make a finding of consistency with the Exchange Act. And I want to get right to the point about why it was reasonable for the Commission to treat different cases differently here. It is undisputed that the spot markets in which the assets underlying petitioner's products trade are fragmented and unregulated in contrast to the situation of the approved futures products where the underlying assets trade only on the CME, which is regulated by the CFTC, and where the Exchange has a surveillance sharing agreement that gives it access to information like market trading activity, customer identification, the tools to investigate a fraud manipulation if it were to occur. Ms. Parisi, I understand that those distinctions that the Commission has drawn, but it seems to me that what the Commission really needs to explain is how it understands the relationship between Bitcoin futures and the spot price of Bitcoin. Because it seems to me that these things, I mean, you know, one is just essentially a derivative of the other. They move together 99.9% of the time. So where's the gap in the Commission's view? So, Your Honor, what the Commission said in its order is that the relationship between the spot and the futures, as to the relevant question that matters here, which is does fraud and manipulation in the spot market affect the CME futures market in the same way? That is an empirical question for which petitioner bears the burden and they did not show that. And the 99% correlation, what the Commission's order says about that, is it said, one of the things it said was that correlation doesn't equal causation, but it did go much further than that. It says it's just an unsupported empirical leap, and this is a JA-172 and NOTE-223. It's an unsupported empirical leap to go from a correlation of once-a-day futures prices to any fraud manipulation in the spot market affects futures in the exact same way. The focus on once-a-day prices doesn't tell you what's happening to intraday prices, and importantly, it doesn't tell you the causal relationship. It doesn't tell you which direction the relationship is moving. And I think the way you can best see that this is an empirical question that petitioners just try to assume their way past is that in the reply brief at 5 to 6, I take them as making the argument that you articulated, Judge Rao, which is that this is just the future, and so necessarily by the nature of a future, the prices in the futures market will just move to meet the spot. But that is 180 degrees precisely the opposite of the economic proposition that they argued before the commission, where they argued in the context of trying to say that they had a surveillance sharing agreement with a significant market that in fact it's the futures prices that lead the market and that spot will move to meet the futures. And they made that point at JA-187 in the notice and at JA-132 to 133 in the slide. So they have argued two opposite economic propositions. They're arguing here that the futures prices will just move to meet the spot. They argue below that the spot will move to meet the futures because futures leads. I think the point is that that is an economic question which they bear the burden of towing the data, and we just don't have the data for that. So it isn't... What kind of data would they have to show? I mean, it seems like it's, you know, it's fine for an agency to say, okay, we need some more information, but it seems there's quite a bit of information here on how these markets work together. And the SEC has not offered any explanation of their actually that, you know, that the petitioners here are wrong in how they're describing the relationship. The SEC, you can say that they bear the burden, they do, but it seems the SEC has to explain why they are wrong in the evidence that they have proffered. Well, Your Honor, I think the commission very clearly laid out one way they could meet their burden, and that's at JA 171 to 172 of the order where they say very explicitly one way that you could meet the commission's concern is if you could show that the spot market price, you could do a lead lag demonstration, you could show that the spot market prices don't lead futures prices. But the showing that petitioners made on that central empirical question was inconclusive is what the commission found. But they have certainly laid out a path for data that petitioners could present. They laid it out very clearly. It's just that, you know, these Bitcoin futures have only been trading since 2017, and what you look at when you look at the studies that the commission, the economic evidence that the commission considered, there were numerous studies in the record that the commission looked at, and the evidence is just mixed at this point. It's bidirectional sometimes. It depends on what period of time you're looking at. So the fact that they haven't been able to make that showing yet doesn't mean that they won't be able to in the future. But what about the fact that the commission in the 2 cream order recognizes that the futures prices are influenced by the spot prices, and the commission concludes in approving the futures ETPs that any fraud on the spot market can be adequately addressed by the fact that the futures market is a regulated one. So, I mean, that's a conclusion that the commission drew just a few months before it denied, you know, the spot Bitcoin ETPs. I'm not sure that's quite what the commission concluded, Your Honor, in the 2 cream order. If you look at footnote 46, it very clearly says that its reasoning in the order does not extend to spot Bitcoin ETPs, and the reason is because in 2 cream, there was a one-to-one relationship between the underlying market, the futures market, and a regulated market with which the exchange had a surveillance sharing agreement. So what the commission said there is we can be reasonably confident that that surveillance will, if the fraud manipulation is targeted at the price of those underlying Bitcoin futures, that the CME surveillance will catch that, so we can reasonably rely on that. But it specifically said in footnote 46, that reasoning does not extend to spot Bitcoin ETPs. I understand that they wanted to reserve that because obviously the commission was looking ahead to these pending orders on the regulation of spot Bitcoin, but that still, I mean, they say that, but what's the logic behind it? Well, the logic is because without, and they go on to say, the key phrase there, I think, is without additional data, right? Without additional data, we cannot be as confident that surveilling the CME futures market will pick up fraud and manipulation that is aimed, that is directed at spot market. They say they can't be as confident, but in approving the futures ETPs, the commission seems, it seems to be that the commission has to have necessarily drawn the conclusion that this, you know, that this arrangement would prevent fraud and manipulation on the underlying spot market because they recognize the relationship between the two markets and they approve the rule for the futures market, so for the futures product. Again, I think that the theory behind looking for this surveillance sharing agreement with a significant market is, is it reasonably likely that a person attempting to manipulate the ETP in question is also going to have to trade in that significant market? So for Tuprium, the exchange had the surveillance sharing agreement with the market where the underlying assets themselves trade. So again, the commission says it can be reasonably confident that manipulation aimed at affecting prices of that Tuprium ETP holding CME Bitcoin futures, that would be caught by the surveillance, but without additional data about whether fraud and manipulation in the spot market impacts futures in the same way. That's the missing empirical piece. You cannot make that, you can't have that reasonable confidence when the case here is you have a spot Bitcoin product and they're trying to rely on a proxy market, here the CME futures market, for their surveillance sharing agreement. So can I ask, does this entire argument then rest on the proposition that both in the Tuprium order and in the order under review, when the commission refers to trading outside of the CME Bitcoin futures market, that means trading outside of the CME Bitcoin futures market, but not the spot market? I'm not sure it has to be, but not the spot market. It's not making any pronouncement one way or the other about the spot market. It's saying wherever the off-CME manipulation is occurring, if it's targeted at, if it's aimed at the CME Bitcoin futures, then we have a surveillance hook for the CME Bitcoin futures surveillance. So again, it's about the... But let's suppose that it at least possibly encompasses, that phraseology at least possibly encompasses the spot market, because I think you just said that it might. You don't have to show that it actually excludes it. So let's suppose that it does include the spot market. Then isn't the necessary upshot of what the commission said and did in Tuprium and then repeated in this order, that if there's manipulation in the spot market, that's going to show up in the futures market and in CME in particular enough that the surveillance mechanism is going to be able to detect it. And therefore, we're okay. Because if that weren't true, then the Tuprium couldn't have been approved. So it didn't say that if manipulation in the spot market is occurring, it will show up. It said if manipulation is occurring off the CME, wherever that may be, and it is targeted at CME Bitcoin futures, then the would-be manipulator is reasonably likely to have to trade on the CME and we will catch it. But it's not talking about all the spot market manipulation that may not be targeted at CME Bitcoin futures, because that was not an issue in Tuprium. And that is the question before the court today. And that is an empirical question that the Tuprium order doesn't address or doesn't answer and that petitioner submissions have not answered. The relationship for spot market manipulation that is targeted at an underlying spot Bitcoin product, that was not addressed in Tuprium. But why wouldn't it necessarily – what's the delta? Why isn't it always the case that manipulation of the spot market, regardless of what your aim – I mean, you could aim to want to affect the futures ETP on the CME. You could aim to want to affect something else. It's just going to follow like the night follows the day that it affects both, because the futures market, of course, it turns on the spot market. Well, again, the causal relationship between futures and spot is the key empirical question that we don't know the answer to. We don't – it may be that spot means future and that futures follows, but it may be that futures leads spot. And if – depending on which one, that's sort of the key empirical question that we don't know. And it's also the focus about the amount of risk is only sort of part of the story, like whether you can detect and deter fraud manipulation also has to do with where you're looking for it and whether you have the tools to investigate it. And so that's what the surveillance framework is looking for, right? It's do you have the tools in place to investigate if a fraud manipulation occurs? From 2.3 on, there was a one-to-one relationship. So the commission is confident that the exchange has the tools in place and they're looking in the right place to catch the fraud manipulation. Ms. Percy, if you don't – if the commission says it's an empirical question about which leads and lags, but they approved the futures product, so don't you have to have a view – doesn't the commission necessarily have to have a view about the lead and lag? If you don't know, then how could you conclude that the futures product is, you know, that it's sufficient to prevent fraud? So, Your Honor, what the commission explained is for 2 gram, the exchange had the sort of expansionary agreement with the market where the underlying assets themselves change. But if you don't know which is leading and lagging, I mean, so what if there's surveillance? I mean, if there's all kinds of fraud on the spot market that is leading the futures market, then – Right, so what the commission explained is you don't need the lead-lag analysis in that context because the lead-lag comes into play where you don't have the one-to-one relationship between the surveillance sharing agreement and the underlying market. Instead, what you have is the case here. You have a surveillance sharing agreement with another proxy market, like a derivative market, and you're trying to say that that surveillance sharing agreement, even though we don't have the one-to-one relationship, is enough and we can be reasonably sure that our proxy market surveillance will be sufficient. And one way to demonstrate that sufficiency is the lead-lag analysis that shows that a would-be manipulator of the ETP in question here, a spot market ETP, would be reasonably likely to trade in this proxy market to manipulate the ETP. So it comes into question when you're using a proxy market like here. You don't need the lead-lag analysis for the 2-prime order because of the one-to-one relationship. This also seems to go to this argument that the commission makes in its brief that it's not concerned, that it's not focused on the actual potential for fraud, only the regulatory detection of fraud. That seems like a very peculiar thing for the commission to be focused on, given the language of the Exchange Act. I mean, can you explain why that is the commission's view, that they're concerned only about regulatory detection of fraud but not actual fraud? Well, I don't think the commission said they're not concerned about actual fraud. I think they said their focus was on detection of fraud, and I think it is a reasonable interpretation of the Exchange Act to focus on surveilling for fraud. It is hard to regulate what you cannot see, and so surveillance is the eyes and the ears, and it's a deterrent so that a would-be manipulator knows that the Exchange has the tools, should a fraud manipulation occur, to track it down and investigate it. So the focus on surveillance is certainly a reasonable interpretation of the Exchange Act because that is how you detect fraud and how you deter fraud. But it's only about surveillance of fraud to the extent that it actually prevents fraud and manipulation, which is the statutory standard. Correct, Your Honor. The statutory standard is the Exchange's rules must be designed to prevent fraud manipulation. So if you can see something, okay, that's fine, but if that thing is affected by lots of things you cannot see, I mean, surely the commission needs to be concerned with the things they cannot see. Certainly, Your Honor. But what the commission has said is there are different ways you could satisfy that statutory language of preventing fraud and manipulation. One way, a tried-and-true way that the commission has approved for decades, is to focus on surveillance because we are confident that having a surveillance sharing agreement with a significant market of regulated size will provide adequate surveillance that will serve the purposes of the statute. But the commission has never said that is the only way to satisfy that statutory language. There is a possibility that other means could also satisfy that language as well. Go ahead. I have one other question. So if we were to agree with the petitioners here and hold that the commission has to treat these two products or that they have not treated the like products alike, would the commission look to approve the spot product or would it go back on its approval of the futures product? I don't know if you can say. I mean, I cannot speak to what the commission would do and I don't want to prejudge what the commission would do, but certainly if you disagreed with the commission's position here and said the fact that the commission would have to think about the issues anew, what it would do with the prior orders, I can't speak to that, Your Honor. But I would like to answer your question. I see my time is up, but you had a question about Chevron deference, Your Honor, that I wanted to briefly touch on. I think it's clear from NetCoalition at 533 that the commission does get Chevron deference here where Congress has expressly delegated to the commission the power to determine if a proposed rule is consistent with the Exchange Act. The situation was very similar there. It was an order. There was an SRO approval order, but this court was very clear that the commission gets Chevron deference in those types of situations where it's interpreting. Has it preserved that argument here? Have you preserved that argument here? Certainly, Your Honor. The commission consistently applied its interpretation and its orders and we raised the Chevron issue. We cited NetCoalition in our brief and said that we get Chevron deference, so I don't see that there's been any waiver. I want to ask you, before we stop, you've mentioned several times that they carry the burden of proof. You emphasize that. It's a way to deflect from a judge's instinct to say, wait, this was your call, what's your explanation? So tell me, so I have it straight in my head, what data is it that you think they have failed to introduce to make the claim that they're advancing now? Specifically, what is it they have not put into evidence for the commission to be able to consider and rule in their favor? Sure, Your Honor. I think the commission highlighted this in its order at JA172 and note 223, but the key empirical question where there's insufficient data for the commission to make its required finding is that the key empirical question is whether fraud and manipulation in the spot market impacts CME futures in the same way, and we don't have conclusive data. Say that again, in the same way? Right. Fraud and manipulation in the spot market would affect futures in the same way so that we can rely on the surveillance of the futures market as a proxy for the underlying ETP spot product at issue here. One way that applicants have tried to make that showing before is with a lead-lag analysis because if you can show that a spot doesn't lead, then you can be reasonably confident that the would-be manipulator of the underlying spot product would be reasonably likely to trade in the futures market so we could rely on that future CME futures market surveillance. But without that missing empirical piece, we can't be sure we can rely on that CME futures surveillance for a Bitcoin spot product in the same way we were when we approved the Bitcoin futures products. Okay. What do I glean from the statement in the two premium order on 21680 that says, in addition, the commission is not persuaded that the market for CME Bitcoin futures contracts stands alone, has a lack of connection with, and is not specifically materially influenced by other Bitcoin markets? That last part talks about a connection in a particular direction. Yes, Your Honor. And we addressed this in the order and brief, but that was in response to an argument from the applicant in that case that said that the CME market stands alone and the commission said, well, we're not convinced that we can go that far. But there is a large delta between not convinced it stands alone and futures fraud and manipulation in the spot market impacts CME futures in the same way. There's a wide gulf between those two, and it's that empirical gulf in the middle where there's insufficient data here. And I have one last question, which is, and this is unrelated to anything we've been talking about so far, and that's just, can you just explain succinctly how the second prong of the test actually furthers the interest? Because the way that the prong is articulated, it indicates that it's bad if there is, if the market that's at issue, the market that's being surveilled, is unduly affected by the product at issue. And to me, it feels like it should be the opposite, because the more that the product at issue affects the market, the more you'd be able to detect manipulation because of. So I think if I'm understanding Your Honor's question correctly, it's not that the market underlying the spot product, the second prong is about trading in the ETP itself, and if it predominates, then there is a concern that the fraud and manipulation could be in that, and that you wouldn't see it in the market that you're surveilling. Because it's not the underlying market, it's trading in the ETP itself, that's the distinction. But why wouldn't the treaty, if the trading in the ETP itself has a dominant influence in the surveilled market, why wouldn't it show up in the surveilled market? I think because you could be trading in the ETP itself, and it wouldn't necessarily show up in the futures market if you were trying to manipulate the ETP itself. Oh, I see, it's the futures of the ETP. Right. Got it, okay. I see. So the underlying asset is the ETP, it's trading in the ETP itself, and it wouldn't. It would not necessarily show up, so that's why there's two prongs to the test, if I'm understanding Your Honor's question. Even if there's a dominant influence, it wouldn't show up? If it predominates, then there could be trading in the ETP as opposed to, and so you could be trying to manipulate the ETP itself, and it would not necessarily show up in the surveilled market such that we have it. What the significant market test is really about is, is there this other market for the, you know, here it's futures that is significant and real. So if the trading in the asset itself here, the SPI ETP, can predominate in that market, then we're not sure if surveilling that other market will capture all manipulation, because you could just be doing it on the ETP itself. Okay. Thank you. Unless this Court has any other questions, we would respectfully ask this Court to hold the order and review. Thank you very much. Thank you, Ms. Parisi. Mr. Brilley, we'll give you three minutes for rebuttal. Thank you, Your Honor. A few points. First of all, with respect to the description of the analysis in Trucrium versus here, my friend from the SEC said that the point of Trucrium was to find fraud that was targeted at manipulating the CME futures market. Again, the orders, the Trucrium order speaks for itself. One can read it. It doesn't say anything like that. It's all about whether fraud and manipulation on other unregulated markets will affect the price, not whether it's a scheme to manipulate some other unregulated market in order to manipulate the CME futures market, and that stands to reason, because you're trying to protect investors from fraud or manipulation, and if there's a fraud manipulation in an unregulated market and it affects the regulated market, why does it matter whether it's targeted? It has the same adverse impact on investors, and so you just won't see that there. And that gets to the point that my friend is trying to draw this distinction between the one-to-one relationship and proxies, but the whole analysis in Trucrium was about proxies. There were all these unregulated Bitcoin futures markets as well as the spot markets, and the issue being addressed was whether fraud and manipulation in those unregulated and therefore unsurveilled markets would have an effect. That was the essence of it. Now, my friend says we made a 180 in our arguments about the relationships between the CME futures market and the spot market. A little context here. The Trucrium order came out while the Commission was considering our order. If one reads 4946, which my friend referred to, you'll see that basically it says, bring us a broomstick of the wicked witch of the West. There's one and only one way we'll let you in, and that's if you prove that CME futures leads the spot market. So we tried. But we also argued in the alternative all of the points that we're making here. Nothing inconsistent here. That's what anyone would do in that situation. And it does get to the point, I submit, that this focus on lead lag is really a red herring. One takes a step back. There are really three possibilities. If a market leads, it means that's where the price is set. And then the other market follows. So if the futures market is leading the spot market, then the surveillance here is going to pick up any fraud or manipulation because the surveillance is of the futures market. If the spot market is leading the futures market, the surveillance is going to pick it up because the effects will show up for all the reasons that we talked about earlier. And if it's an arrow points both ways kind of situation where there isn't one consistent leader and one consistent lagger, same point. It's going to be picked up when it shows up. And I do think, getting to Judge Edwards, your question about what the data is, we already put the data in. It's the 99.9% correlation. It's the expert comments from experts in the field. That's in there. And part of the reason that we submit that this is an unreasoned order is that they just kind of went like this. They just shrugged at that. They said, well, it's not enough. But they didn't say why it isn't enough in the face of, and that happens. It's unrebutted. Nobody came in and said anything else in this proceeding. They have to explain why that isn't enough to satisfy the demands of reasoned decision making. And a shrug doesn't get you there. And then, let me just make sure I've got everything covered here. Yeah, no, I think that's it. Just one final point, if I could. You know, they say that in that footnote 46 of the two-crime order, they say, and then twice in this order they say, there's reason to question whether the CME surveillance will pick up spot market fraud. They never actually say why there's a reason to question. And that's the whole problem, given what they said in the two-crime order. They can't just say, well, maybe it'll be different in the face of our evidence. They've got to explain why it's different. And they completely failed to do that, and the reason is because they can't. I have one question that is on just in the body of the order near this footnote 46, on the question of whether the order is predicated around the idea that it's all about whether there's targeting, as opposed to just in effect whether there's targeting. The way the commission framed it is thus the CME surveillance can reasonably relied upon to capture the effects on the CME Bitcoin futures market caused by a person attempting to manipulate the proposed futures ETP. In that sense, certainly, but that's a subset of what it catches. It's not the sum total of what it catches, and it can't be because this has come up repeatedly in the court's questioning, but in order to have approved the futures product, they have to have decided the statutory standard was met, which is that it prevents fraud and abuse, that the rules of the exchange are designed to prevent fraud and manipulation that will affect the product that's being applied for, and that's why I said the intent to target doesn't matter if you could show that there is fraud and manipulation and it would affect the underlying asset and it isn't provided. There's nothing in the design of the exchange that protects it. They said you can't satisfy the statutory standard, but they found the statutory standard satisfied. That's the key thing. They found it satisfied, and that's why I think their targeting argument doesn't really get them anywhere. Okay. Oh, I'm sorry, Your Honor. I did have one point about the second prong, because Your Honor raised it if you don't mind. Yeah. I think Your Honor was getting at something. There are some points we made in our brief about the inconsistency of the true premium on that, et cetera, but there's a basic point here. It's another one of the contradictions in this order, if you think about it, and I think Your Honor's questions were getting at it. They say, on the one hand, that we haven't made a sufficient record that fraud manipulation that occurs in the Bitcoin spot market will show up. On the other hand, they're saying there's an undue risk that the Bitcoin spot market, that RETP or Bitcoin spot will have such a powerful effect on the price of the CME futures market that we won't be able to discern. You can't say both of those things at the same time. They completely contradict each other. Thank you. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Rao, Edwards